BISSELL (MEISTER v.). See Case No. 9,398.

━━━━━

## Case No. 1,450.

### BISSELL v. MEPHAM.

[1 Woolw. 225;[1] 2 West. Jur. 268.]

Circuit Court, D. Missouri. Oct. Term, 1868.[2]

PILOTS—WHEN TWO PILOTS ARE NECESSARY, AND WHETHER MASTER MAY ACT AS ONE OF THEM—PAY OF OFFICER DOING DOUBLE DUTY—MASTER'S LIABILITY FOR INJURY TO CARGO.

1. The rules or practice of sea-going vessels do not require two pilots, nor preclude the master from acting as one of two pilots.
[See U. S. v. The Science, Case No. 16,239.]

2. No case establishes a different rule in the navigation of our interior waters.

3. The act of August 30, 1852 (10 Stat. 61), does not establish a different rule.

4. The fact that insurance companies require two licensed pilots as a condition of their issuing policies on vessels navigating our interior waters does not create, in this respect, a public policy having the force of a law.

5. Whether two pilots are necessary, and whether the master may act as one of them, depends upon the requirements of the voyage, and is a question simply of whether the vessel is well manned, officered, and equipped.

6. The rule is sometimes held that an inferior officer, compelled, by an accident to his superior occurring during the voyage, to discharge the duties of the latter, is entitled to no additional compensation. This rule does not apply to the case of parties who, before the voyage, agreed for the double service of master and pilot to be discharged by one person.

7. The storage of the cargo, on steamboats on western rivers, is under the special charge of the mate. By the maritime law, the master is personally liable to the shippers, in many cases, for injury to the cargo, because, in the absence of the owners of the vessel, personal credit is given to him.

8. As between the master and owners, he is liable only for reasonable care and diligence.

[Appeal from the district court of the United States for the eastern district of Missouri.

[In admiralty. Libel by Peter Bissell, for the recovery of pilot's wages, against the respondents, Michael S. and William G. Mepham, owners of the steamboat Iron City. Decree for libellant, reversing the unreported decree of the district court.]

Mr. Leighton, for appellant.
Sharp & Broadhead, for respondents.

MILLER, Circuit Justice. This is an appeal from a decree in admiralty, of the district court for the eastern district, dismissing the libel of Bissell, the appellant.

The appeal was argued and submitted at the October term, 1867; and rather on account of the importance and novelty of the principles than of the amount of money involved in it, has been held under advisement until the present term.

[1] [Reported by James M. Woolworth, Esq., and here reprinted by permission.]

[2] [Affirmed by supreme court in Mepham v. Biessel, 9 Wall. (76 U. S.) 370.]

The rapid growth of commerce, since the settlement of Idaho and Montana territories, has stimulated the use of steam navigation on 2000 miles of the Upper Missouri river, where heretofore has rarely floated anything more nautical than the fur-trader's Mackinaw. The great length of the river, flowing through an uninhabited region, thus opened to actual and useful steamboat navigation,— a navigation limited to a small portion of the year, and to vessels of light tonnage,— has given rise in the courts to questions in admiralty of much difficulty, and which, in the absence of precedent, demand great circumspection on the part of the courts in their determination.

The defendants were the owners of three steamboats engaged, in the spring of 1866, in the trade from St. Louis to Fort Benton, the extreme point of steamboat navigation. One of these vessels, the "Iron City," made a voyage to that point from St. Louis, which, including twenty-six days during which she was in the service of the United States government, occupied from the 16th of March to the 26th of July of the year mentioned, a period of four months and ten days. During this time, the libellant, by agreement with the owners, acted as master and as pilot, and, according to the testimony, with a single alleged exception, to be noticed hereafter, discharged fully the duties of both positions. The defendants claim that there was a special contract in regard to compensation; but we concur with the judge of the district court, that it is not established by the testimony.

This suit is brought to recover compensation as upon a quantum meruit, for those services as master and pilot. The libel and the answer concur that the services, both as master and as pilot, were rendered, and that they were so rendered according to agreement made between the parties before the boat started on her voyage.

It is now argued that this contract was void, as being a violation of some principle of public policy, or of some rule of law concerning the navigation of such vessels. To sustain this proposition, no reference has been made to any rule of maritime law, to any usage, or to any decided case. The libellant was regularly licensed as a pilot. Besides him there was another licensed pilot on board all the time, whose competency is not questioned. To maintain the ground taken, it is necessary to assume that it is an established rule that two pilots are necessary to a vessel, and also that no one acting as master can fill the place of one of them. There is no such principle in the rules or usages governing the navigation of seagoing vessels. They have no regular pilots while at sea. The course of the vessel is directed by the master, who governs, if he does not actually manage, the wheel. On approaching a port, or in navigating a narrow bay or river, he takes a pilot, to whom, for the time, he surrenders his vessel. But in such case, only one pilot is required. The inference from maritime usage therefore is, that but one pilot is ever needed, and that, in the ordinary direction of the vessel, the master acts as pilot. No case has been decided, so far as we know, which establishes a different rule in regard to the navigation of our internal watercourses.

We are referred to the act of congress of August 30, 1852 (10 Stat. 61), concerning vessels propelled in whole or in part by steam. That act contains, for the construction, equipment, navigation, and control of steam-vessels, a system both minute and comprehensive, designed to secure the comfort and safety of passengers. In a statute of this character, if anywhere, we might expect to find the rules laid down that every vessel shall have two pilots, and that no person shall act as both pilot and master at the same time. But while all pilots are required to be examined and licensed, and a penalty is imposed when any other than a pilot so licensed is employed, neither of these rules is prescribed by the act.

It would appear from the testimony of one of the defendants, that insurance companies require that a vessel should be provided with two pilots, as a condition to the issuing of policies on such vessel or her cargo. He says, that the reason for getting a pilot's license for the plaintiff, which he assisted in procuring, was to satisfy this requirement of those companies. It may be necessary to the proper manning of steamboats that, in long and continuous voyages on our inland waters, they should have two pilots; and until assured that this requirement is answered, insurance companies may very properly refuse to issue policies on such vessels. But this course of dealing, especially as it is aside from the matter of this contract, cannot create a public policy having the force of law. The advantages which these companies, and others connected with trade and commerce, such as railroad and express companies, banks, &c., have over the public, is already sufficient, without giving to the stipulations which, for their own protection, they insert in these contracts, or to the rules on which they conduct their business, a power equal to that of a legislative enactment. The question whether two pilots are necessary to a steamboat is not, therefore, to be settled by reference to any principle adopted by insurance companies in the conduct of their business, nor, indeed, by a regard to the reasons for such a principle, but only by a consideration of the requirements of each particular voyage. At most, the inquiry could be only whether the vessel were sea-worthy, and well manned, officered, and equipped for the service expected of her. If a boat run but from St. Louis to Alton, or any other voyage to be completed in a few hours, or a longer distance with stoppages, during which he may

obtain necessary rest, one pilot is sufficient; but if it be a long voyage of continuous running, then, as the navigation of our rivers requires a skilled pilot to be always at the wheel, two are necessary. So, in determining whether, there being two pilots on board, one may act as master, the real inquiry in each case is, whether the vessel, under all the circumstances, is sufficiently manned, officered, and equipped. In a trade which demands the constant care and vigilance of the captain in person— as, for instance, in voyages where the boat lands every hour or two, to receive or discharge cargo or passengers, requiring each time the attention of the master or his substitute, the mate—one man may be unable to discharge properly the duties of master and of pilot. On the other hand, in a voyage of several thousand miles, during which, between the points of departure and destination, the vessel may have occasion to stop only for fuel, where the crew is small, and their discipline a matter of form, the tonnage of the vessel light, and the cost of freight of necessity burdensome, it may be for the interest of all, the owner of the vessel as well as the shipper of the cargo, to place the command in the hands of one who, by performing also the duties of pilot, can curtail the expense of transportation.

Such a case is the one before us. On that ground, no valid objection to this contract is apparent.

It is, however, insisted, that the libellant, being employed as master, is entitled to no additional compensation for his services as pilot, on the ground that his duty as master required him to supply the deficiencies of all the other officers of the boat; in fact, that in serving as pilot, he was only discharging his duty as master. It is true that there are some cases which hold that when, by the death or illness of the master during a voyage, a mate is compelled to discharge the duties of his superior officer, he is entitled to no additional compensation on that account. These decisions rest on the ground that, having undertaken to discharge all the duties which might devolve upon him as mate, the new duties devolved upon him by accident were included in the undertaking, and are, in contemplation of law, paid for by his wages as mate.

The authorities are not uniform on this point, but those which hold the doctrine place it on the ground mentioned. In the case before us, however, it is agreed that the libellant and the respondents contracted, at the outset, for this double service. They did not, however, agree upon any price for it, nor upon any price for his services in either capacity separately. The libellant was engaged at the start as pilot as well as master, and his services were as necessary in the former as in the latter character. In fact, such services were usually valued higher than those of master. It is not, then,

a case of new duty accidentally devolving upon the master by reason of his office; but it is a duty totally distinct from that of master and of a more valuable class, which, by contract made beforehand, he undertook to perform, not as part of his services as master, but as additional thereto. Under such circumstances, there does not appear to be any sound reason for refusing him a reasonable compensation for the double services which he rendered.

It remains to ascertain what should be allowed for these services. We have no positive statement of their value by any witness, except the libellant himself. He estimates them at from $1000 to $1200 per month. The defendant thinks $200 or $300 per month would be sufficient. Fortunately, there are some undisputed facts which enable us to come to a satisfactory result. Besides the parties, the only two witnesses examined are Bush, the mate, and Stone, the other pilot. They both concur in the statement that, besides discharging his duties as master, the libellant did full duty as pilot. It also appears that he was well acquainted with the river for 800 miles between Forts Union and Benton, where Stone, the other pilot, had never been. Stone, who was introduced as a witness by the defendant, also testifies that Bissell did as much piloting as he, and that he also faithfully did his duty as master. Stone, for his services as pilot, according to an agreement which received the approbation of the defendants before the boat left St. Louis, was paid $800 per month. When the boat entered the service of government, Stone left her, and a pilot named Goring was employed at $700 per month. In the settlement made by the respondents with government, $1000 per month was allowed for the libellant's services, and received by the defendants.

From these undisputed facts, it seems fair to conclude that libellant's services as master and pilot should not be rated lower than $900 per month. At this rate, for four months and ten days, they would amount to $3900. From this sum there must be deducted $1000, which the libel admits to have been received on account.

The respondents claim that the further sum of $1000 should be deducted for damages, which, through the libellant's carelessness and negligence in the discharge of his duties as master, occurred to flour during the voyage, and for which they had been compelled to pay. If this allegation be established, the amount paid should be charged against him. But the only evidence tending to support this statement is the fact that one hundred sacks of flour, shipped at St. Louis for Fort Benton, were found, on arrival at the latter place, to be damaged, and that $1000 was allowed the owners for the injury.

The flour was placed on deck by order of the owners. In passing over a sandbar, it, with other parcels of the cargo, was taken

off to lighten the vessel. In reshipping, after the boat had passed the bar, some twenty sacks of it, under the supervision of the mate, and without the knowledge of the master, were stowed in the hold. Besides the libellant, the mate is the only witness who testifies on this subject. He declares that other sacks of flour, not of this lot, which were placed in the hold with these, were not injured. It also appears that the damage was found to exist in other sacks, which were of this lot, but were not placed in the hold. From this testimony, it cannot be presumed that the injury was caused by the stowage in the hold. But if it were so, the custom seems to be settled, that the manner of storing the cargo in steamboats, on the western rivers, is a matter under the special charge of the mate. In this case, at least, it is clear that what was done by him was in violation of the orders, and without the knowledge, of the libellant.

No proof is offered to show that the flour was sound when received, or that the injury was not the necessary effect of the long voyage on some peculiar condition of the flour. Nor is any evidence given of the manner in which the loss was settled with the owners of the flour,—whether by a lawsuit, by arbitration, by the order of the defendants, or of some agent or consignee of their vessel at Fort Benton, or by the libellant or master. In reference to all this we are left to conjecture.

It is certain that no actual carelessness, negligence, or want of attention on the part of libellant is shown. If he is to be held liable at all, it must be upon a principle which would make him liable to the owners of the vessel for every loss for which they or the boat would be liable to shippers or passengers. Can such a principle be maintained? It is undoubtedly true that, by the maritime law, although the master may have no interest in the vessel, he is yet liable to the shippers in many cases where, by the general principles of the common law concerning principal and agent, he could not be held. This personal liability of the master for contracts and obligations which he undertakes as agent or servant of the shipowners, who reap all the profits of the voyage, and pay him only a stipulated compensation, grows out of the fact that while the owners may be unknown, or beyond the reach of the contracting parties, personal credit is given to him by parties who, thus dealing with him, must be protected.

But when the question is one between the master and the owners, it does not seem just that the former should be held to anything more than reasonable care and diligence, and the exercise of such skill as his position may be supposed to require. In other words, while, according to the stringent rules governing common carriers, the owners are liable to shippers, and while the master also may be liable to them to nearly if not quite the same extent, it by no means follows that his liability to the owners is governed by the same rules.

Such a doctrine would make it very unsafe for any responsible man to act as a master, because he would become practically an insurer to his employers, against the rigid obligations which they have assumed to third parties, as common carriers. We are not aware that any such principle has received the sanction of the courts.

Applying these views to the facts of the present case, we do not perceive how the libellant can be held responsible to the respondents for the damage done to the flour, even conceding, what is not proved by the testimony before us, that the injury was suffered during the voyage, and was one for which the boat was liable.

The libellant, therefore, is entitled to a decree for the sum of $3900, less the $1000 paid him, with interest by way of damages on the $2900, from July 1, 1866, to the present time. Judgment accordingly.

[NOTE. This decree was affirmed by the supreme court on appeal. The court (Mr. Justice Swayne delivering the opinion), held, as the damage to the flour arose from inherent causes, and as it was stowed without the knowledge or direction of the master, he is not liable. Mepham v. Biessel, 9 Wall. (76 U. S.) 370.]